## BRANSON, ET AL. *v.* THE OREGONIAN RAILWAY CO., AND OTHERS.

CORPORATIONS—STOCKHOLDERS' LIABILITY.—The provisions, in the constitution and statutes of Oregon, creating the liability of stockholders in private corporations, for the indebtedness of such corporations, apply to such only as are, or have been, holders of the legal title, in unpaid stock.

CONTRACT—RATIFICATION—INFERENCE.—The ratification of an unauthorized act or contract, professedly done or entered into on behalf of a corporation, may be inferred from its subsequent conduct in respect thereto, the same as if it were a natural person. The amounts specified in contracts, to pay definite sums of money, with a certain rate of interest, on or before stated periods, in freight and passage over the promisor's railroad, become due, together with the stipulated interest, at once in money, upon the failure of the promisor to comply with the terms of its agreement, and its depriving itself of the power to comply with it, by the sale and disposal of its railroad.

MISTAKE—SURPRISE—INADVERTENCE.—The supreme court has power under sec. 100 of the civil code, to entertain an application to relieve a party from a decree taken against it "through its mistake, inadvertence, surprise, or excusable neglect" and appealed before it has had an opportunity to make the application to the lower court, by which the decree was rendered; and upon setting such decree aside, upon such application, it is also within its power to remand the cause for further proceedings, in accordance with its decision.

APPEAL from Yamhill County.

*Effinger & Bourne,* for Oregonian R'y Co.

*Ellis G. Hughes,* for himself and co-defendants.

*James K. Kelly,* for respondents.

By the Court, WATSON, C. J.:

This suit was brought by the respondents, Branson et al.,

to establish the liability of the appellants upon certain alleged contracts of the Dayton, Sheridan and Grand Ronde Railroad Company, of the character generally denominated "freight receipts," or "freight script." This company was duly incorporated under the laws of Oregon, November 14, 1877. Its object was the construction and operation of a narrow gauge railroad from the town of Dayton to Grand Ronde, in Yamhill county, with suitable branches and extensions. Its capital stock was fixed at $200,000, divided into 2,000 shares of $100 each. Joseph Gaston subscribed for 1,000 shares, and other parties also subscribed to the aggregate amount of $51\frac{1}{2}$ shares more of the capital stock of the company. At a meeting of the stockholders, held March 22, 1878, B. B. Branson, W. S. Farrell, Ellis G. Hughes and Sylvester Powell were elected directors; and thereafter, and on the same day, the company was duly organized by the election of Hughes as president, and Beach as secretary. After the incorporation of the company, however, but previous to its organization, certain sums had been subscribed by residents along the route of the proposed railroad, and as an inducement to its construction, payable in installments, at specified stages in the progress of the work, according to certain forms previously devised and authorized by the incorporators, by the terms of which the amounts so subscribed and paid, were to be repaid by the company in three equal payments, on the first day of November, in each of the years 1880, 1881 and 1882. The forms so authorized concluded thus: "Payment of the said subscriptions to be evidenced by suitable freight orders, or script, to be issued to said subscribers." On the same day the company was organized, viz.: March 22, 1878, it entered into a written contract with Gaston, under the name of "J. Gaston & Co.," for the construction and equipment of that

portion of its proposed railroad extending from Dayton to a point on the south side of Yamhill river, opposite the town of Sheridan. By the terms of this contract, Gaston was to construct such portion of the company's railroad, together with a dock at Dayton, a station house at Sheridan station, and other suitable station houses, side tracks, water tanks, &c., and equip the same with a specified number of locomotives, engines, freight, passenger and section cars, and have it in operation by September 1, 1878. The company, on its part, was to secure the right of way; turn over to Gaston the installments becoming due on the subscriptions mentioned, and the amounts paid on stock, and, in the language of the contract itself, "as a further consideration for the construction and equipment of said railroad * * agrees to issue to said Gaston & Co. certificates entitling them to fifteen hundred shares of the capital stock of said railroad company, which shares shall be by the said construction and equipment of said railroad from Dayton to Sheridan station, paid for in full, and thereafter to be free from all assessments."

The amounts evidenced by the "freight receipts," which form the basis of the respondents' claims in this suit, were received by Gaston, under his contract with the company, and seem to have been expended by him in the construction of the railroad. At the April term, 1881, of the circuit court for Yamhill county, the respondents severally recovered judgments, in actions at law, against this company, on certain of these "freight receipts" held and owned by them respectively, and inclusive of costs, amounting, in the aggregate, to the sum of $35,664 52. They afterwards caused executions to be issued upon these judgments, which were returned wholly unsatisfied. They then resorted to this suit to compel the payment of their judgments by the ap-

pellants.   The circuit court rendered its decree in their favor, and directed that the execution issued thereon be enforced against the property of the appellants, in the order following:   1st, the Oregonian Railway Company, limited; 2d, the Oregon Railway Company, limited; 3d, Wm. Reid, Ellis G. Hughes and J. B. Montgomery; 4th, J. Gaston.

After an appeal had been taken from this decree, and the cause brought into this court, the Oregonian Railway Co., limited, appeared by its duly authorized attorneys and moved that other attorneys be substituted in the place of Ellis G. Hughes, Esq., its attorney of record, on the ground of a conflict of interest between him and his client, in the result of the suit.   The motion was allowed, and thereupon said company appeared by its attorneys so substituted— Messrs. Effinger & Bourne—and filed a motion for an order remanding the cause to the circuit court, with leave to amend the separate answer of such company, in several particulars alleged to be material.   This motion, with the proofs in support of it, was submitted, at the hearing upon the merits, and will be considered and determined after the errors alleged to appear by the record of the cause in the court below have been disposed of.

The case made for the respondents, in their amended complaint, is, that the "freight receipts" upon which their judgments at law were recovered, were valid contracts of the Dayton, Sheridan & Grand Ronde Railroad Company, which, upon its failure to redeem, in freight or passage over its railroad, according to their terms, became at once due and payable in money; that Gaston's stock in said company was never paid up; that Gaston afterwards subscribed for 5,000 shares of the capital stock of the Willamette Valley Railroad Company, of $100 each, which was never paid up; that Gaston, Hughes, the Oregon Railway Company, limited,

and the Oregonian Railway Company, limited, successively took and held the legal title to all of said stock, in the order of their enumeration, through voluntary sales and transfers; that the Willamette railroad company, in consideration of a conveyance to it by the Dayton, Sheridan & Grand Ronde Railroad Company, of the railroad and property of the latter, lawfully assumed and bound itself to pay and satisfy the debts and liabilities of the latter, including the amounts due, or becoming due, on said " freight receipts;" that said companies are both wholly insolvent; and, finally, that Reid, Montgomery and Hughes, as sureties of the Oregon Railway Company, limited, for a sufficient consideration, obligated themselves to Gaston to indemnify, and save him harmless from all liability on account of his ownership in said stock.

The pleadings, on the part of Reid, Montgomery and Hughes, the Oregon Railway Company, limited, and the Oregonian Railway Company, limited, raise issues upon all of these matters, except as to Gaston's subscriptions for stock, the successive ownership of all the stock subscribed by Gaston in both companies, in the order designated, and the insolvency of the Dayton, Sheridan & Grand Ronde and Willamette Valley railroad companies.

As to whether the " freight receipts " were authorized by the Dayton, Sheridan & Grand Ronde Railroad Company, and are legally binding upon it, it does not seem there ought to be much question. If the incorporators had no power to authorize the subscriptions, upon account of which they were afterwards issued, in advance of the corporate organization, or, if the president and secretary had no express authority from the corporation, after it was organized, to issue them pursuant to the terms of such subscriptions, such action on the part of its incorporators and officers was after-

wards ratified in the most ample and satisfactory manner. The very first act, on the part of the company, after its organization—its contract with Gaston of March 22, 1878—contained an implied ratification of the action of the incorporators authorizing such subscriptions, and fully sanctioned the subsequent execution of the "freight receipts" by the president and secretary. Besides, there is abundant evidence, of the most conclusive character, in the record, showing that the company ever afterwards, recognized and treated them as valid and binding obligations. The principle that a corporation is bound by its conduct and representations, in the same manner and to the same extent as a natural person would be, will hardly be questioned.

Upon the legal proposition advanced by the respondents, that whenever the company failed to perform its agreement to pay, in freight or passage over its railroad, and put it beyond its power to perform, the amount specified in the "freight receipts" became due in money, there is some conflict among the adjudications in this country; but, in our judgment, the weight of authority and the better authority supports it. (*Roberts* v. *Beatty*, 21 Amer. Decis., 410, and cases cited in note; *Wolf* v. *Marsh*, 54 Cal., 228.)

The "freight receipts" in question were, in form, promises by the company to pay so many dollars on or before certain specified dates, in freight or passage over the company's railroad, and come, we think, clearly within the principle of the foregoing decisions. The proofs introduced upon the issue, as to whether Gaston's stock in the Dayton, Sheridan & Grand Ronde Railroad Company was paid up, or not, "by the construction and equipment" of the company's railroad from Dayton to a point on the south side of Yamhill river, opposite Sheridan, according to the terms of his contract with the company, of March 22, 1878, conclusively

show that they were not so paid up. It is true, the railroad was constructed, properly equipped, and in operation by the time agreed on; but the grading was not finished, the station houses not built—except one at Dayton; the iron, track, fixtures and bridge-bolts used in the construction of the railroad not paid for, but incumbered with heavy liens for their purchase price, and there were failures in many other minor particulars. Nor was Gaston able to complete his engagements under this contract. Nevertheless, at a meeting of the directors, held November 5, 1878, at which were present Hughes, W. S. Farrell and F. E. Beach, and no others—the full board consisting of five members—the following resolution was adopted:

" It is further resolved that the president and secretary issue and deliver to J. Gaston & Co. shares of the capital stock of the company, fully paid up, and free from assessment, which they are entitled to by virtue of their contract for the construction of the company's railroad from Dayton to Sheridan and from Junction to Dallas, amounting to —— shares in all."

It is contended, on behalf of the appellants, that the stock issued to Gaston, under this resolution, must be deemed and treated as paid up stock. Assuming that this resolution means to declare that Gaston is entitled to the 1,500 shares of paid up and unassessable stock, under his contract with the company for the construction and equipment of its railroad, still it would not protect subsequent purchasers with notice of the actual facts. (Thompson's Liability of Stockholders, sec. 201.)

Hughes was a director, the president and the attorney of this company throughout; and afterwards a director and the attorney of the Willamette Valley Railroad Company; a director and the attorney of the Oregon Railway Company,

limited; and lastly, the agent and attorney of the Oregonian Railway Company, limited. We are speaking now solely from the record brought before us by the appeal. As president of the Dayton, Sheridan & Grand Ronde Railroad Company, and on its behalf, in connection with Beach, its secretary, he executed the contract with Gaston for the construction and equipment of its said railroad, and is chargeable with knowledge of its contents. And from the very nature of Gaston's engagements, and Hughes' threefold official relations to the company, and his duties arising therefrom, it would seem that he ought to be charged also with knowledge that those engagements had not been fulfilled when such resolution was adopted. He tacitly admits, in his cross-examination, when testifying as a witness on behalf of the appellants, that he knew the iron used in the construction of the railroad had not been paid for by Gaston, but states that Gaston's contract "did not require him to pay for the iron." If Hughes had actual notice of the fact that Gaston had not complied with his contract, and was therefore not entitled to receive any shares of paid up stock, when this resolution was adopted, his co-appellants, who afterwards took transfers of the legal title in such stock to themselves, by virtue of the relation which he sustained to each of them respectively, at the time such transfers were taken, are chargeable with notice to the same extent.

But it is neither essential, nor as it seems to us very important, in determining whether the decree appealed from should be sustained or not, whether Hughes had such notice, or whether there is any liability on the part of any of the appellants on account of past or present ownership of this stock. There is no pretense that the 5,000 shares of capital stock subscribed by Gaston in the Willamette Valley Railroad Company has ever been paid, and this stock

has passed through the same hands and by the same transfers as the former. We think the undertaking on the part of the Willamette Valley Railroad Company to assume and pay all the debts and liabilities of the Dayton, Sheridan & Grand Ronde Railroad Company, including its liabilities on "freight receipts," fully made out by the proofs. The proposition of the former to the latter, was to purchase its railroad and other property, and upon a complete transfer and conveyance thereof to the former, it would assume and pay " all " the latter's debts, "both secured and unsecured, amounting in the aggregate to about one hundred and thirty thousand dollars, with some accumulated interest." The proposition, which was in writing, and duly subscribed, was presented to the directors of the latter company, and accepted as a whole by a resolution, which after reciting the acceptance, undertook to enumerate the various debts of the latter company included in the proposition, and provide a form for the conveyance to be executed by its president and secretary, in the event of the action of the directors being ratified by the stockholders, which also included a specific mention of debts to be assumed and paid as the consideration of such conveyance. In this enumeration various debts, amounting to $8,564 65, are mentioned as debts of the company. Then follows an account of what is styled "the indebtedness or obligations on the part of Joseph Gaston, contractor, for labor, material or property actually used or employed in the building of the road," amounting in the aggregate to $23,643 48. Then follows this declaration: " And also to pay, in freight, all of the obligations of this corporation, which by their terms are so payable." In the form provided for the conveyance this last provision is not given, but, in its place, the following: "And also all indebtedness or obligations on the part of the company or Joseph Gaston,

contractor, for labor, material or property actually used or employed in the building of the road, including claims for right of way, or in operating the said road, in the way of warehouses," etc. There is no mention, in this description of debts, either in the resolution itself or the form provided for the conveyance of any secured debt, although secured debts are expressly included in the proposition, and must have made up the greater portion of the sum of $130,000 stated therein as the approximate amount of "all debts, both secured and unsecured." The stockholders of the Dayton, Sheridan & Grand Ronde Railroad Company duly ratified the acceptance made by the directors, and the conveyance was made in the form authorized, omitting the last clause thereof, above quoted.

The contract between the two companies was consummated when the proposition of the one was duly and fully accepted by the other, and it would seem strange if its operation could be narrowed down by an imperfect or mistaken recital of its terms, in the deed subsequently executed to carry out the stipulations of one party to the contract, as between the parties themselves, or others occupying no better positions. Besides, it appears from the proofs that afterwards, on December 20, 1879, the Willamette Valley Railroad Company solemnly alleged, in its answer to a complaint filed against it and others, in the circuit court of the United States for the district of Oregon, by the Pacific Rolling Mills Company, that the sum of $130,000, named in its said proposition, as the probable amount of debts of the Dayton, Sheridan & Grand Ronde Railroad Company, and which it assumed and undertook to pay, was made up of about $35,000 "freight script" issued to the citizens of Polk and Yamhill counties, for cash advanced, in the construction of said railroad; about $35,000 of floating debts

of the Dayton, Sheridan & Grand Ronde Railroad Company and Joseph Gaston, contractor; and "the $60,000 agreed between said companies to be justly due to the complainant." But without any explanations of this character, the Willamette Valley Railroad Company became liable, by the very terms of its engagement, to pay these "freight receipts" if they came within the definition of "debts" of the Dayton, Sheridan & Grand Ronde Railroad Company, which they did beyond all question. Upon the acceptance of the conveyance from the latter company of its railroad and property, the former became liable to the holders of the "freight receipts" for the amounts due thereon according to their terms, and in the event of its insolvency (which is admitted in this case) every holder of its unpaid stock became liable to the extent of the unpaid balance thereon, as well as every previous holder, having made a voluntary sale and transfer thereof. (Chap. 7, title 1, sec. 14, Mis. Laws.)

This virtually disposes of the objections to the decree of the court below, as to all the appellants except Reid and Montgomery. It is admitted by the pleadings that Gaston, Hughes, the Oregon Railway Company, limited, and the Oregonian Railway Company, limited, took and held the legal title to the 5,000 shares of unpaid capital stock, amounting to $500,000, of the Willamette Valley Railroad Company, successively, in the order in which they are named. Upon their liability on this ground alone the decree of the circuit court may well be sustained. But neither Reid nor Montgomery is alleged to have ever held the legal title to any of this stock. Their liability depends upon the construction to be given a certain undertaking of indemnity executed by them, Hughes, and the Oregon Railway Company, limited, to and in favor of Gaston, on April 2, 1880. Hughes was, and since December 29, 1879, had been, holding the legal

title to the stock before mentioned, and all other rights, in-
terests and claims belonging to Gaston, in, to, or against
either the Dayton, Sheridan & Grand Ronde Railroad Com-
pany, or the Willamette Valley Railroad Company, in trust,
under certain written assignments, executed to him by Gas-
ton, to dispose of or transfer to any person or corporation
who or which might provide the means to pay off, or the
indemnity against, certain debts and liabilities of Gaston's,
in such written assignments specified, and also make some
other payments and provisions not material to be considered
here. The undertaking of indemnity, after reciting the
terms and object of the assignment to Hughes, and that the
Oregon Railway Company, limited, had been incorporated
and organized by Reid, Montgomery and Hughes, for the
"express purpose of receiving a transfer, assignment and
conveyance" of said capital stock, &c., from Hughes as
such trustee, and complying with the terms (specifying
them) upon which Hughes was authorized to make such
transfer; and that Hughes, in pursuance of his trust, and
"at the special instance and request," and for the "joint
and several personal interest, benefit and advantage" of said
Reid, Montgomery and Hughes, had "by a deed of assign-
ment of even date," "duly assigned, transferred and set
over to the said Oregon Railway Company, limited, all and
singular the said railroad capital stock, rights, interests,
claims and demands," &c., and declaring that, in the execu-
tion of such undertaking of indemnity they act "as private
individuals acting for" themselves, "and to promote" their
"private and personal interests, in the said Oregon Railway
Company, limited," &c., proceeds as follows:

"We do hereby contract and agree to pay off and dis-
charge all the debts and liabilities of the said J. Gaston and
J. Gaston & Co. which may have been incurred for or arising

out of the construction of the said Dayton, Sheridan & Grand Ronde railroad, and its Dallas branch, and J. Gaston and the Dayton, Sheridan & Grand Ronde Railroad Company, incurred for labor or material furnished or used in the construction or operation of the said Dayton, Sheridan & Grand Ronde railroad and its said Dallas branch, * * * so as to save harmless, in all respects, the said J. Gaston and J. Gaston & Co., from all pecuniary liability whatever upon all and every matter or thing, of every description, incurred for, or arising out of the construction or operation of the said Dayton, Sheridan & Grand Ronde railroad and its Dallas branch."

This undertaking also contains an express declaration that all the covenants and agreements therein on the part of Reid, Montgomery and Hughes, "are made for and on behalf of the Oregon Railway Company, limited." Such is the purport of the obligation upon which the court below decreed the liability of Reid, Montgomery and Hughes, as guarantors of the Oregon Railway Company, limited, in respect to the covenants therein expressed in Gaston's favor. This portion of the decree is, in our judgment, erroneous. Gaston's having at one time been the legal owner of the unpaid capital stock before mentioned, and having made a voluntary sale and transfer thereof, constitute the only grounds of his liability for the demands of the respondents in this suit. There is no provision in this obligation indemnifying him against such a liability. The Dayton, Sheridan & Grand Ronde Railroad Company became indebted individually for the amounts subscribed and paid, for which the "freight receipts" were issued. As soon as the amounts subscribed became payable, under the terms of subscription, by the progress of the work of construction, it belonged to Gaston under the stipulations in his contract with the com-

pany, and never became a debt against him, or against him and the company, "arising out of the construction of said railroad." It never was a debt or liability of his own individually, or of his and the company's together, against which only the obligation undertakes to indemnify him. And if the money so received by him and expended in procuring "labor and material" used in the construction and equipment of the railroad, could, by any possible interpretation, be held to be included in the description, "labor and material used in the construction and equipment of said railroad," still it would avail him nothing; for it is evident that he incurred no indebtedness or liability on account of it. Such being our view of the effect of this undertaking of indemnity, it follows that the decree against Reid and Montgomery should be reversed.

We come now to the consideration of the motion to remand. Hughes, as the attorney for the Oregonian Railway Company, limited, appeared for it in this suit, and filed its answer herein to the complaint, verified by himself as its attorney, for the reason, as stated in his affidavit of verification, "that none of the officers of said company, either the president, secretary, treasurer, or any of the directors, are now within the state of Oregon." This answer was filed July 21, 1882. It contained an express admission of the truth of the allegation in the amended complaint, that "said capital stock was transferred to said company on December 11, 1880, and did not controvert the further allegation in such amended complaint in respect to such stock that such corporation is now the owner thereof." As we have already said, these admissions in the pleadings exhibit this company as the legal owner and last holder of said unpaid capital stock, and establish its primary liability as fixed by the decree of the circuit court. On the same day the answer

was filed, a stipulation also was filed, subscribed by the respondents' attorney, and by Hughes as attorney for said company, containing the same admission, in substance.    In the joint and several answer of Reid, Montgomery and Hughes, and the separate answer of the Oregon Railway Company, limited, both of which were filed in the suit by Hughes as attorney, the transfers of this stock to Hughes as trustee, and then to the Oregon Railway Company, limited, alleged in the amended complaint are admitted, but in both said answers the claim is set up that said individuals and said corporation were acting throughout such transactions merely as the agents and sureties for their co-defendant, the Oregonian Railway Company, limited, and should in no event be held liable for the demands of the respondents.

It appears from Hughes' own deposition taken on behalf of the appellants in the suit, as well as by the terms of the conveyance from the Oregon Railway Company to the Oregonian Railway Company, limited, of December 11, 1880, that these admissions of the transfer of stock to the latter from the former company, in the separate answer and stipulation referred to, were incorrect, and untrue in fact.    As the equitable owners of the stock merely, the Oregonian Railway Company, limited, would not be liable to contribute to the payment of the respondents' demands. (*Mun* v. *Currie*, 2 Barb., 294; *Adderly* v. *Storm*, 6 Hill, 628; Thompson's Liability of Stockholders, secs. 178–9.)

Still, if Hughes was the duly authorized agent of this company, in taking the legal title to this stock in his own name, acting in good faith, and with such a degree of skill and prudence only as was required of him in view of the nature and terms of his employment, as the company would be liable over to him for any loss sustained by him by reason of having taken and held such legal title for the com-

pany, by its direction, and all parties being before the court, it would seem entirely within the rules of equity to make the company liable, in the first instance. But the principal, in such case, can be reached only through its implied indemnity to its agent. If no agency existed, or if existing, it has been exceeded or abused to such an extent as to preclude any recourse on such implied indemnity, by the agent himself, third parties claiming through him are equally precluded. But it is obvious that the alleged principal should be allowed an opportunity to make its defense before being adjudged liable. The pleadings in this suit, presented no such issue, neither was there any evidence introduced that had any bearing upon the question, save that given by Hughes himself. On the motion to remand, the Oregonian Railway Company, limited, strenuously contends that Hughes was not its agent in the matter of taking and holding the legal title to this unpaid capital stock, and that whatever authority he did have to act as its agent, in purchasing such stock for it, was exceeded and abused to such an extent as to preclude any recourse he might otherwise have had against it; and particularly in this: that such purchase was authorized only on the condition that such stock was wholly and absolutely free from " all mortgages, debts, claims and encumbrances whatsoever, according to the laws of Oregon;" that Hughes and Reid, upon whom it relied, in the transaction, with full knowledge of all the facts, did represent the stock to it as being thus free and unencumbered and thereby induced it to take whatever action it did take in the premises. If this state of facts were established, it would constitute—assuming that the company never held the legal title in the unpaid capital stock—a good and complete defense for it, in this suit. And whatever the actual facts may be, which a regular trial would develop, it is sufficient

to say, in this place, that the party moving to remand has presented *ex parte* proofs in support of its motion which, in connection with facts appearing in the record of the suit itself, in our judgment, clearly entitle it to be heard before its liability is finally determined—if it be not now too late to let in a defense on the merits.

The Oregonian Railway Company, limited, was a foreign corporation, incorporated and organized under the laws of the United Kingdom of Great Britain and Ireland, and having its principal place of business at Dundee, Scotland. Service of the summons in this suit was made on Reid as its managing agent in this state, June 13, 1881. Hughes, its regular attorney, being absent, Reid procured other attorneys who appeared for it and filed a demurrer to the complaint and continued to manage its defense until Hughes' return. On this motion, the company contends that it never had any notice of this suit, except such as may be implied from the knowledge of Reid and Hughes as its managing agent and attorney, until after the decree in the circuit court had been rendered against it. The evidence on this point is conflicting. That it had no actual notice of the character of the defense made for it by Hughes, and of the admissions made in its answer in respect to the transfer to it, and its ownership of said unpaid capital stock, upon the proofs offered upon the motion to remand, seems to us pretty well established. From the time it is shown to have obtained actual notice of these facts, it is not chargeable with any laches in making efforts to have the decree opened up, and to be let in to make its defense on the merits. The case was already appealed and pending in this court, and the company embraced its first opportunity to appear in court by other attorneys than Mr. Hughes, to

make its application for such relief, by filing its motion to remand, together with the proofs in its support.

Assuming that this court has the power to grant the relief sought by this motion, which we do not doubt in the least, in view of the provisions made in secs. 100 and 534 of our civil code, the most serious objection to its exercise, in the present instance, is the fact that the party making the motion was represented by its duly authorized attorney in the suit when the damaging admissions, which it seeks to be relieved from, were made, and it has not been shown that he is insolvent or unable to respond in damages, if found to be in fault in the matter, to the full amount of the decree against his principal.   The rule seems to be pretty well settled, upon the decisions, that where an attorney appears for a party without authority, and fails to present his case properly; or, having authority to appear, suffers judgment to be taken against his client by default, through negligence or misconduct on his own part, and the adverse party has acquired rights thereunder, and such attorney is able, pecuniarily, to respond for any damage or loss occasioned by his wrongful interference, or misconduct, the court will not interfere to grant relief to the injured party in a summary manner, on motion, but leave him to his recourse against the attorney individually.   (*Denton* v. *Noyes*, 6 Johns, 296; *Meacham* v. *Dudley*, 6 Wend., 514; *American Ins. Co.* v. *Oakley*, 9 Paige, 496; *Thomas* v. *Jorden*, 57 Pa. St., 331.)

But the facts in the case before us are not, in all respects, similar to those reported in any of the foregoing cases, or any other we have examined on the subject.   In the case here, the respondents could not have been ignorant of the facts disclosed by the record itself, in the testimony given by Hughes, and in the terms of the conveyance of Decem-

ber 11, 1880, from the Oregon Railway Company, limited, to the Oregonian Railway Company, limited, that the admissions in the separate answer of the latter, and in the stipulation filed at the same time, and by which the sole ground of the latter's liability, alleged in their amended complaint, was established, were not true in fact, and virtually fixed its liability on a ground which did not exist. They are chargeable with the knowledge that if these admissions were not justified by the facts, Hughes, as attorney merely for the Oregonian Railway Company, limited, without further express direction, or under peculiar circumstances, not claimed to have existed in this case, had no authority to make them, and that under such circumstances his interests in this regard were necessarily inimical to those of his clients. The same may be said concerning the claim of agency set up in the joint and several answer of Reid, Montgomery and Hughes, and the separate answer of the Oregon Railway Company, limited, so far as it may be supposed to have influenced the course taken by the respondents in the case. They are chargeable with the knowledge that Hughes, as attorney merely, had no right to thus place his client between them and himself, and make it primarily liable, and without special authority to do it—it having no other representative in the suit besides himself. At most, respondents, in equity and good conscience, which we understand furnishes the rule in such cases, can only claim that the Oregonian Railway Company, limited, has made default in this matter, while the causes of such default and the facts excusing it have been all along known to them. "Adverse parties" could hardly "acquire rights" under such circumstances that should preclude an innocent party, without laches, from having the default set aside, and being allowed a hearing upon the merits, upon such terms as justice might

demand. Besides, the large amount of the decree—in this instance over $35,000—in view of the fact that there has been no showing before us as to Mr. Hughes' ability to respond for so large a sum, with accumulating interest and costs of litigation, if he should ultimately be adjudged liable therefor in a separate action between the Oregonian Railway Company, limited, and himself, prevents us from presuming that, in such an event, the company would have ample recourse.

Whatever doubts we may have entertained, at any time, as to the propriety of making the remand, have been, in no inconsiderable manner, relieved by the declared willingness on the part of Mr. Hughes, for himself and co-defendants for whom he appeared on the appeal, that such order, if within the power of the court, should be made, with leave to all parties to reframe their pleadings so as to present the real merits of the case as between the appellants. It is therefore our opinion that the decree in this cause should be set aside, with leave to all parties to amend their pleadings, in accordance with the views hereinbefore expressed, and upon such terms and under such directions as the circuit court shall order.

Respondents to have costs and disbursements of appeal.

By WALDO, J.

I am of the opinion that the Oregonian Railway Company, limited, would be liable under the law, to contribute towards the satisfaction of the judgments of the respondents which form the basis of this suit, by reason of having been the holder of the legal title, in the unpaid stock, subsequent to the recovery of such judgments, whether the "freight receipts" are to be deemed contracts to pay, in money, after failure to pay in freight and passage, according to their

terms, or simple contracts to carry freight and passengers—as I am inclined to think they are.